UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

**JUN 09 2005**

CLERK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR. 05-40016 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| vs. | \* | REPORT and RECOMMENDATION |
| | \* | (Motion to Suppress Evidence, Motion |
| | \* | To Exclude Evidence Regarding Drug |
| REYES FABIAN OLIVERA-MENDEZ, | \* | Dog Certification) |
| and SERJIO RUELAS, | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending are Defendant's Motion to Suppress Evidence (Doc. 52) and Defendant's Motion to Exclude Evidence Regarding Drug Dog Certification (Doc. 88). The motion to suppress was made by Defendant Olivera Mendez and joined by Defendant Ruelas. See Doc. 56. The Motion to Exclude was made by Defendant Ruelas. A hearing was held on Tuesday, April 5 and continued on Friday, April 8. Further testimony and evidence was heard on Thursday, May 5, 2005. Defendant Olivera-Mendez was personally present and represented by his counsel of record, Mr. Jack Friedlander and local counsel Clint Sargent. Defendant Ruelas was personally present and represented by his counsel Mr. John Schlimgen. The Government was represented by Assistant United States Attorney John Haak. South Dakota State Highway Patrol Trooper Christopher Koltz, Nebraska State Highway Patrol Sergeant Andrew Duis, and South Dakota DCI Agent Earl Miranda testified at the hearing. Fourteen exhibits were admitted into evidence. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended to the District Court that both the Motion to Exclude Drug Dog Certification Evidence (Doc. 88) and the Motion to Suppress (Doc. 52) be **DENIED.**

## JURISDICTION

Defendants are charged in an Indictment with possession with intent to distribute five (5) kilograms or more of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated February 1, 2002.

## FACTUAL BACKGROUND

### The Traffic Stop and Search

South Dakota Highway Patrol Canine Officer Chris Koltz was on duty on the afternoon of Thursday, January 13, 2005, when he observed a red Isuzu traveling eastbound at a high rate of speed on Interstate 90 near Sioux Falls. TR 56-57. The radar indicated the Isuzu was traveling 71 miles per hour in a 65 mile per hour zone. TR 57. Trooper Koltz activated his lights and stopped the Isuzu near milepost 402. Id. The traffic stop occurred at approximately 3:14 p.m. Id.

Trooper Koltz approached the passenger side of the Isuzu and asked the driver (Mr. Olivera-Mendez) for his driver's license and vehicle registration. TR 58. While standing outside the passenger side door, Trooper Koltz could smell the strong odor of an air freshener coming from the vehicle. Id. He thought it was unusual to be able to smell an air freshener so strongly in such cold (below zero) temperatures. Mr. Olivera-Mendez (the driver) did not have an actual driver's license, but handed Trooper Koltz a photocopy of the front side of a driver's license. TR 59, EX 2. The driver also produced a photocopied owner's certificate which showed the Isuzu was registered to Daniel Garcia. TR 67, EX E. The front side only of the certificate had been copied, and in Trooper Koltz's experience, the person to whom the vehicle is being transferred is listed on the back of the certificate. TR 67. Mr. Olivera-Mendez's name did not appear anywhere on the Certificate of Ownership. TR 67, EX E. One of the occupants of the vehicle also produced a vehicle registration from the state of Washington, which also listed Daniel Garcia as the owner of the Isuzu. TR 68-69.

Trooper Koltz asked Mr. Olivera-Mendez to have a seat in the patrol car and explained a warning ticket would be issued for speeding. TR 71. Mr. Olivera-Mendez complied. Trooper Koltz wrote out the ticket and asked Mr. Olivera-Mendez about his itinerary and his occupation. Mr. Olivera-Mendez indicated he was coming from Pasco, Washington and going home to Hammond, Indiana. (The temporary plates on the Isuzu were from Illinois). TR 72. When Trooper Koltz

questioned Mr. Olivera-Mendez about having Illinois plates on the vehicle when he lived in Indiana, Mr. Olivera-Mendez explained he used a friend's address to obtain the Illinois plates. TR 73. Trooper Koltz explained to Mr. Olivera-Mendez he did not believe such a procedure was legal. TR 73. Mr. Olivera-Mendez can be heard on the video tape explaining his belief that the practice of licensing a vehicle in a state where one does not maintain a residence is legal in Indiana/Illinois. EX 1B. Mr. Olivera-Mendez also explained he worked for a boat repair shop, doing "Bondo" work. TR 74, EX 1B. At 3:23 p.m., Trooper Koltz called in the temporary Illinois license plate number to state radio dispatch. TR 74. Dispatch could not find the number on file. Id. Next, Trooper Koltz requested dispatch to run the Isuzu's vehicle identification number (VIN), and that number came back as being owned by Mr. Olivera-Mendez. TR 74-75.

As Trooper Koltz was speaking with Mr. Olivera-Mendez and waiting for the information from dispatch, he observed Mr. Olivera-Mendez made very little eye contact, appeared slumped down in the passenger side of the patrol car, constantly tapped his leg with his hand, and licked his lips, all indications of nervousness. TR 76. Trooper Koltz asked Mr. Olivera-Mendez whether he had any outstanding fines or warrants for his arrest, and Olivera-Mendez stated he did not have any outstanding warrants, but had a few speeding tickets in the past. TR 76, EX 1B.

The non-present third party (presumably Mr. Garcia), the nervous behavior, and the strong odor of air freshener in the vehicle were all indicators of drug smuggling in Trooper Koltz's experience. TR 77. Trooper Koltz asked Mr. Olivera-Mendez whether there were any illegal drugs in the Isuzu, or whether the drug dog would indicate to the exterior of the vehicle. TR 77-78. Mr. Olivera-Mendez said no. Id.

Trooper Koltz questioned Mr. Olivera-Mendez about his photocopied driver's license. TR 78. Mr. Olivera-Mendez claimed one of the reasons for his trip was that he needed to return to Washington to get a duplicate Washington driver's license, so he could return to Indiana, get an Indiana driver's license, and register his vehicle in Indiana. TR 78. Trooper Koltz did not think Mr. Olivera-Mendez's explanation made sense, and his suspicion was heightened when Mr. Olivera-Mendez explained he intended to have a family member mail the duplicate license anyway. Id.

Trooper Koltz completed the ticket and ran a radio check of Mr. Olivera-Mendez's driver's

license information at 3:28[1], and while he was waiting for that information from dispatch, Koltz walked his drug dog (Ajax) around the Isuzu. TR 78. Ajax alerted to the Isuzu rear passenger door area. TR 78-79, EX 1B. Ajax alerts by sitting. TR 79. Just as Ajax was in the process of alerting, dispatch came back with the information about Mr. Olivera-Mendez's driver's license. TR 79. Trooper Koltz returned Ajax to the patrol car, and told Mr. Olivera-Mendez the dog had alerted to the presence of drugs in the Isuzu. TR 80. Trooper Koltz told Mr. Olivera-Mendez the alert gave him probable cause to search the vehicle, and that it would be searched. Id., EX 1B. Trooper Koltz requested another officer (Knutson) to come to the scene, so Mr. Olivera-Mendez and his passenger, Mr. Ruelas, could sit in the second patrol car during the search. TR 80. Trooper Koltz made this request for safety reasons, and because the temperature was below zero that day, and he only had one seat in his patrol car, so he needed a place for Mr. Olivera-Mendez and his passenger (Mr. Ruelas) to sit and stay warm while the Isuzu was searched. TR 80.

When Trooper Knutson arrived, Trooper Koltz approached the passenger, Mr. Ruelas (who had remained in the Isuzu) and conversed with him briefly about what was going to happen. TR 81-82. Trooper Koltz also asked Mr. Ruelas some of the same questions he had asked Mr. Olivera-Mendez. TR 82. Trooper Koltz explained that although Mr. Ruelas spoke "limited English" he could answer questions and knew exactly what Trooper Koltz was talking about when Trooper Koltz spoke to him in English. TR 156-57. Mr. Ruelas gave a slightly different story from that of Olivera-Mendez, stating he was in the construction business (Mendez had stated they both worked as "Bondo" men in a boat repair shop) and that he was traveling to Indiana from Washington for the first time looking for work (Mendez stated they were roommates in Indiana and had lived there for approximately a year). TR 82. None of this conversation is recorded, however, because Trooper Koltz forgot to turn on his remote recording device. Both Mr. Olivera-Mendez and Mr. Ruelas were then frisked for weapons (none were found) and placed in Trooper Knutson's vehicle while the Isuzu was searched. TR 83. Trooper Koltz searched the Isuzu but could not get the carpet up because it appeared to be glued. He did not find any contraband. TR 87. He suspected a hidden compartment.

---

[1]Trooper Koltz explained the driver's license check was a combination check for the validity of the license, as well as a check to see whether there are any wants or warrants for the individual. TR 269-70.

TR 87-88. He suspected a compartment because of the drug dog's alert, the conversation with the driver and passenger, and he found another air freshener in the back of the Isuzu, sitting on top of the carpet in the rear storage area near some duffel bags. TR 88. Trooper Koltz also thought the glued carpet was suspicious. Id. Trooper Koltz called another trooper (Brian Swets) who had experience in the location of hidden compartments. TR 88-89. Trooper Koltz can be heard on the video talking with Trooper Swets, describing Mr. Olivera-Mendez and Mr. Ruelas as "two Hispanic males" who have given "terrible stories" and describing some of his suspicions, including the air freshener in the back portion of the vehicle and that he could not get the carpet up. Trooper Koltz explained that none of the screws appeared to be "messed with" and there did not appear to be a void space in the roof. He also explained he had removed the side panels and they were dusty. EX 1B. Trooper Koltz told Swets he thought the drugs might be in the gas tank, and that he (Swets) gave him some things to look at before he "kicked them (referring to Olivera-Mendez and Ruelas) loose." EX 1B. Trooper Koltz also told Trooper Swets "old Ajax smacked it right down." EX 1B.

After Trooper Koltz spoke with Swets on the phone, he returned to the Isuzu and opened the back hatch door. EX 1B. He searched for approximately five more minutes. Trooper Koltz pulled the glued carpeting up to see a thin strip of Bondo[2] across the entire back of the rear bed, and another strip across the entire front of the rear compartment (just behind the passenger seats). TR 92, 261-62. The paint did not exactly match. TR 92. Trooper Koltz called his lieutenant to ask permission to tow the Isuzu to the Highway Patrol garage for a more thorough and safe search, out of the elements, and described some of these findings to him during the phone call. EX 1B. Approximately one hour after he stopped the Isuzu for the speeding violation, Trooper Koltz called for a tow truck. EX 1B.

Mr. Olivera-Mendez and Mr. Ruelas were transported to the Highway Patrol garage in a separate vehicle. On the video recorded by Trooper Knutson's vehicle, Trooper Koltz can be heard explaining to the men "here's the deal, we're going to tow the vehicle. We'll take you right there with us. If we don't find anything you'll be free to go." EX 4B. The tow truck arrived in approximately fifteen minutes, and the drive to the Highway Patrol garage took approximately

---

[2]Bondo is "a trademark for a variety of materials used to repair automobile bodies." American Heritage Dictionary of the English Language (4th Ed. 2000)

twenty-five minutes. EX 4B. The Isuzu arrived at the Highway Patrol garage at approximately 5:00 p.m. TR 230.

Two other troopers (Lieutenant Joffer and Trooper Wollman) joined Troopers Koltz and Knutson at the garage. TR 92. They made the same observations as Trooper Koltz had regarding the suspicious Bondo in the back cargo area. TR 92-93. Trooper Koltz got Ajax out of his patrol car and put him in the inside of the Isuzu, and Ajax laid down and stared at the back cargo area. TR 93. Trooper Koltz explained he believed there was an access panel to the compartment somewhere, but they could not find it. TR 153. The officers continued to search, and expected to find an electronic control or a cutout panel, but were unsuccessful. Id. Lieutenant Joffer suggested contacting the South Dakota DCI for assistance with talking to Mr. Olivera-Mendez and Mr. Ruelas about the possibility of a hidden compartment in the Isuzu. TR 95. DCI Agent Miranda spoke with Mr. Olivera-Mendez at approximately 6:30 p.m.[3] He can be heard on the video tape saying "the long and the short of it is before we can let you go we have to make sure there's nothing under there." EX 1B, 6:32. Agent Miranda can then be heard asking for permission to make some small holes in the bed of the Isuzu, to which Mr. Olivera-Mendez responds "you have been searching for three hours and you haven't found anything so why don't you let us go? I don't want you to put holes in it." Id. Agent Miranda did not advise either Mr. Olivera-Mendez or Mr. Ruelas of their *Miranda* rights, because he believed they were not in custody. TR 473.

Mr. Olivera-Mendez and Mr. Ruelas were in the garage sitting in chairs as the troopers were conducting the search. TR 105. They can be seen on the video tape mulling around. EX 1B. Trooper Koltz testified that he believed the men were free to leave during this time, although neither he nor anyone else ever told them so. TR 115. Shortly after the discussion with Agent Miranda, Mr. Olivera-Mendez and Mr. Ruelas disappear from sight on the tape. EX 1B. Trooper Koltz testified they indicated they were hungry and wanted something to eat. TR 106. One of the troopers on the scene (Wollman) complied with their request, and gave them a ride to at a nearby truck stop so they could get something to eat. Their wallets, money and identification were returned to them

---

[3] Agent Miranda testified he arrived about 6:00 p.m. TR 475. The time stamp on the tape in which Agent Miranda can be heard talking to Mr. Olivera-Mendez indicates he spoke with him at approximately 6:30.

before they were taken to the truck stop. TR 108. Trooper Wollman did not stay with Olivera-Mendez and Ruelas, but rather left them at the truck stop before he went to another engagement. Id.

Meanwhile, DCI Agent Kjonegaard applied for a search warrant to obtain permission to drill into the bed of the Isuzu. TR 98, 107. The search warrant was issued, signed by state Circuit Court Judge Gene Paul Kean at 9:04 p.m. EX 3. After the warrant was issued, the officers drilled into the bed of the Isuzu, and the drill bit came back up with a white, powdery substance on it that field tested positive for cocaine. TR 107. The drill bit was taken into evidence, and the Isuzu was then transported to the Sioux Falls Police Department garage, where better tools for actually opening the compartment were available. TR 108. On the video, the officers are seen actually sawing and prying open the floor of the cargo area on the Isuzu. EX 1B. The compartment in the floor bed/ cargo area of the Isuzu was opened, and fifteen (15) kilos of cocaine were discovered. TR 108, EX 1B.

Mr. Olivera-Mendez and Mr. Ruelas remained at the truck stop while the DCI and the troopers applied for the search warrant. After the drill bit revealed what field tested positive for cocaine, the officers alerted Sioux Falls Area drug task force agents, who went to the truck stop, located Olivera-Mendez and Ruelas, and arrested them. TR 107.

### Ajax, The Drug Dog

Trooper Koltz's first drug dog, Kaz, retired in 2004. TR 50. January 13, 2005 (the date of the traffic stop which is the subject of this motion) was Ajax's first day on the job. TR 131-132. This was his first deployment. Id. Ajax was two years old when Trooper Koltz obtained him and went through an eleven week police service dog training program, sponsored by the Nebraska State Patrol, in Grand Island, Nebraska. TR 50, 52, 55, 186. Trooper Koltz explained that while the initial training occurred in Grand Island, he and Ajax also participated in training scenarios in South Dakota locations during the training period, as evidenced by his training records (EX A, F). The purpose of the training is threefold: to teach the dog basic apprehension skills and to detect odors of illegal drugs, and to teach the handler how to correctly deploy the dog in the field. TR 53-54. The culmination of the program is a certification exam, which the dog and handler must pass as a team. TR 54. Trooper Koltz testified he and Ajax received their certification on January 11th. TR 55. Ajax is a "passive" indicator, meaning when he gives his indication to an odor he is trained to detect, he will sit, stand, or he will stand and stare or he will lie down. TR 55.

Sergeant Andrew Duis testified regarding Ajax's certification as a drug dog. Sergeant Duis is employed by the Nebraska State Highway Patrol Police Service Dog Division. His method of training is in accordance with the International Congress of Police Service Dogs. TR 397. He has been certified as a judge under that system by Captain Kirby, one of the system's three international teaching judges here in the United States. TR 397-98.

Sergeant Duis conducts training programs for many law enforcement agencies, including the Nebraska State Highway Patrol, Iowa State Patrol, South Dakota Highway Patrol, and the Kansas Police Dog Association. TR 400. The goal of his program is to teach the handler how to teach the dog. Id. Sergeant Duis conducted the eleven week training program which resulted in Ajax's certification. TR 401. The program teaches the dog obedience and patrol maneuvers, and then moves on to drug detection functions. TR 401-402. The drug detection portion of the training includes familiarizing the dog with the odors of the drugs and various environments he might encounter in the field. TR 402-03. Next, the dog is taught to indicate to the odor of the drugs and to search for the odors. TR 403-04. Finally, the dog goes through the certification process. TR 404. A grade sheet is used to memorialize the certification process. TR 407.

Trooper Kolz and Ajax's grade sheet was received into evidence as EX 5. The date on the grade sheet is January 10, 2005. Id. Sergeant Duis explained the certification process actually lasted two days, beginning on January 10th and ending on January 11th. TR 454-458. This is also noted on Trooper Koltz's Police Service Dog records (EX F), where Ajax's certification exam results are noted on pages 143-148. The majority of the handwritten notes on the grade sheet were made by Sergeant Duis. TR 409. Sergeant Duis explained the dog is graded on a scale of one through six; one would be perfect, six would be the opposite end of the scale. TR 415. Ajax scored three sixes on his certification exam—twice for failure to locate an odor. TR 416. A maximum average score of 4.0 for each area of skill is required for certification, (indication, searching, and handler skill), as well as a maximum overall average score of 4.0. At least one 4.0 or better[4] score is also required

---

[4]In this context, 4.0 or better actually means 4.0 or *lower*. There was a considerable amount of confusion about this during the hearing (TR 313). Trooper Koltz's testimony was not a model of clarity on this point, but he consistently and forcefully testified that Ajax was certified. TR 54-55, 306, 308-09, 351, 353-354.

for each of the individual odors.  TR 416-417.  According to the grade sheet for Ajax and Trooper Koltz, they received an overall final examination GPA of 3.25 (4.0 for indication, 2.6 for searching, and 2.71 for handler skill).  EX 5.  The requirement for each individual odor is not an average, but rather the dog must receive at least one 4.0 or better score on each odor to be certified.  TR 417-18.

Sergeant Duis explained that during the certification process, Ajax first received a 6.0 when he tested for cocaine.  EX 5.  He received a 6.0 because he did not locate the odor.  During the certification process, the dog is allowed one "re-fire" search.  Ajax's re-fire search for cocaine on January 11th scored a 2.0.  TR 419, EX 5, EX F p. 147.  The result is that Ajax met the certification requirement of having at a 4.0 or better for each odor.  EX 5  (And a total average GPA of 3.25).  EX 5.  Sergeant Duis concluded that Ajax is good at hunting and excellent at searching, and "certainly knows the odors."  TR 419.  He also noted Ajax "certainly doesn't have an issue with false indications."  Id.  His biggest criticism was that Ajax, as a "passive" indicating dog, had a tendency to "molest" his target.  Id.  Sergeant Duis prepared the Certificate of Achievement after the certification process, memorializing that Ajax and Trooper Koltz passed the certification requirements.  TR 420-21.  The date on the certificate is January 10, 2005, the date the certification process began.  Sergeant Duis explained he used that date because that is the date that appears on the grade sheet which contains the testing data.  TR 454-55, 458.  He further explained "the certificate I guarantee you was not prepared until after the process was completed."  TR 458.  Sergeant Duis also stated "I will not –if the dog has issues, if the dog's not searching properly, if the dog has issues with false indication, if the handler has problems, I won't pass that team because I will not put them on the street because it does no one any good."  TR 466.

## DISCUSSION

### (Motion to Exclude Evidence Regarding Drug Dog Certification–Doc. 88)

On April 26, 2005, Defendant Ruelas  moved to exclude the introduction of any "tangible or documentary evidence relating to the training, qualifications, or certification of the dog Ajax or his handler that has not previously been disclosed through discovery."  Mr. Ruelas also requested that any testimony based on such tangible or documentary evidence be prohibited, all pursuant to Fed. R. Crim. P. 16(d)(2)( c).  Defendant Olivera-Mendez did not join in the motion but filed a "Memorandum of Law in Support of Motion to Suppress" (Doc. 93) in which he asserted the

certification documentation and testimony should not be considered by the court because they were not properly disclosed pursuant to Rule 16 or alternatively, Rule 26.2.

Paragraph 1 of Judge Piersol's original Order Fixing Dates (Doc. 11) provided that "the following general discovery rules shall apply to this case:" Paragraph 1 proceeded to direct the parties to, upon request from the other, comply with discovery requests pursuant to Fed. R. Crim. P. 16, Brady v. Maryland, and the Jencks Act. Paragraph 2 of the Order required that "all discovery motions as to the Defendant herein shall be filed and served on or before January 25, 2005; that opposing counsel respond thereto on or before January 31, 2005." Thereafter, continuances were granted. Judge Piersol entered an Order dated February 16th (Doc. 36) in which time for discovery was changed: "all discovery motions as to Defendant herein be filed and served on or before February 18, 2005; that opposing counsel respond thereto on or before February 25, 2005." Id. ¶ 4. Thereafter, on March 3, 2005,[5] Defendant Olivera-Mendez filed a general "Motion for Discovery" (Doc. 46) and a "Motion to Compel Discovery" (Doc. 47). Doc. 47 specifically requested records pertaining to the training and certification of the drug dog. On January 28, 2005, Defendant Ruelas filed a general "Motion for Discovery" (Doc. 27) which also requested training and testing records pertaining to the drug dog. The Government filed responses to both Defendant Ruelas's discovery motion and Defendant Olivera-Mendez's Motion to Compel. See Docs. 44 and 60. In both responses, the Government explained:

---

[5]Notably, Defendant Olivera-Mendez missed the new deadline for filing his discovery motions by nearly two weeks. His motions were due on February 18th, but were filed on March 3rd (the deadline for filing "all other motions.") Defendant Olivera-Mendez also complains that he did not have a copy of the search warrant "until long after the time for pretrial motions had passed." This is ironic, because he did not make his discovery motion–in which he claims to have first asked for a copy of the warrant–*until the same day he made his motion to suppress*–March 3rd. See Doc. 46 (motion for discovery) and Doc. 52 (motion to suppress), both filed March 3rd. That is, he criticizes the government for being tardy in replying to his discovery motion, which was itself tardy. The government could not possibly have responded to his motion by February 25 because the discovery motion was not filed until March 3!

After Defendant Olivera Mendez received a copy of the warrant, he did not make a further motion to suppress based on any alleged deficiencies in it, nor did he ask for a continuance to do so. The Government responded to Olivera-Mendez's discovery motion and to his motion to compel (regarding the drug dog certification) four days later on March 7th. See Doc. 59 and 60. The search warrant and supporting affidavit were produced on April 5th. TR 7.

The South Dakota Highway Patrol maintains some records regarding these requests. The United States has submitted a request to the Highway Patrol for the records in its possession. When the United States receives those items, it will furnish the items to the defense. It appears that the defendant's requests may seek more information than is contained within the records maintained by the Highway Patrol. If the discovery request cannot be resolved by the parties, it will be brought to the Court's attention.

The basis of the Defendant's Motion to Suppress was the traffic stop was impermissibly extended, the vehicle was seized without probable cause, and the Defendants were arrested without probable cause or a warrant. See Doc. 52. Documentation regarding the drug dog was provided to the Defendants at the beginning of the first day of suppression hearing (April 5)–the Government having apparently just received it from the State Highway Patrol. TR 6-12. It is not entirely clear, but it appears the documentation contained in EXs. A and F (Trooper Koltz's training records for Ajax) is the documentation that was produced to the Defendants on April 5th–the first day of the suppression hearing. TR 375. After the first day of the suppression hearing, Defendants apparently received additional discovery, which does not appear to be relevant to the drug dog issue (reports, narratives, photos, and the video from Trooper Knutson's patrol car). TR 178-181. Then, on April 12th–after Trooper Koltz finished his testimony on April 8th, but before the final day of the suppression hearing on May 5th, the Defendants received two more documents regarding Ajax's qualifications–his "grade sheet" from certification process which was the culmination of the eleven week training program, and a copy of his Certificate of Completion, certifying that Trooper Koltz and Ajax successfully demonstrated the minimum performance requirements as a Narcotics Detector Dog Team at the Nebraska State Patrol Training Academy. TR 380, Doc. 93, ¶8. Both of those documents were prepared by Andrew Duis, the Nebraska State Patrol officer who testified on the last day of the hearing (May 5th). TR 409, 420-21, 430.

Defendants assert it was the Government's burden to prove Ajax was properly certified and because it did not provide documentation to prove certification until after the deadline to respond to discovery requests according to Judge Piersol's Amended Order Fixing Dates (Doc. 36), the evidence should not be considered.[6] The Government asserts Defendant Ruelas does not have

---

[6]The new deadline for the Government to respond to defense discovery requests was February 25. Recall the Defendant Olivera-Mendez did not make his discovery motions until

standing to raise the issue because, as a mere passenger in the vehicle, he does not have standing to challenge the search in the first instance. The Government also asserts the documentation regarding the drug dog requested by the Defendants was not in its possession or control, so it was never obligated to provide it under Rule 16, and no discovery sanctions should apply.

### A.    Mr. Ruelas Had No Legitimate Expectation of Privacy in the Isuzu

The Government asserts Defendant Ruelas does not have standing to challenge the search of the vehicle in the first instance, and therefore does not have standing to exclude the qualifications of Ajax, the drug dog. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).

In Rakas, the United States Supreme Court held the passengers of a vehicle (who had no ownership interest in the vehicle) which was stopped and searched after a robbery were not entitled to challenge the search of the vehicle. Since Rakas, the Eighth Circuit has reaffirmed many times that a mere passenger or non-owner of a vehicle has an insufficient privacy interest in a vehicle to challenge a search. See e.g. U.S. v. Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004) (concluding the defendant did not have standing to challenge the search of the vehicle in which he was riding "as a mere passenger, therefore, Barragan could not claim a legitimate privacy interest . . . and he lacks standing to challenge the search of the vehicle."). There has been no evidence presented in this case that Mr. Ruelas had any ownership interest in the Isuzu. Therefore, he has no legitimate privacy interest and no standing to challenge the search. See also U.S. v. Payne, 119 F.3d 637, 641 (8th Cir. 1997) cert. den. 522 U.S. 987, 118 S.Ct. 454, 139 L.Ed.2d 389 (1997) (passenger had no legitimate

---

March 3rd well *after* the Government's time to respond had passed. The Government can hardly be faulted for not responding before the request had been made (at least as to Defendant Olivera-Mendez–Defendant Ruelas made his timely request on January 28th. See Doc. 27). The Government did respond and indicate it had requested the records. See Docs. 44 and 60. The fact remains that the Highway Patrol did not provide the records to the U.S. Attorney until the first day of the suppression hearing.

expectation of privacy in car and therefore had no standing to challenge search).    Because Mr. Ruelas has no standing to challenge the search, he likewise has no standing to challenge the basis for the finding of probable cause for the search–the reliability of Ajax, the drug dog.  Technically, Mr. Ruelas is the sole Defendant who made the motion to exclude the evidence regarding Ajax's training and certification.  While Defendant Olivera-Mendez filed a brief in support of the motion (albeit captioned "Memorandum of Law in Support of Motion to Suppress") (Doc. 93) he did not join the motion nor file one of his own regarding exclusion of evidence as to the drug dog's reliability.    Because no party with standing has made the motion to exclude the records of Ajax's certification, the motion could be denied without further discussion.  Nonetheless, the merits of the motion are addressed.

### B.    The State Highway Patrol Records Were Not in The Government's Possession or Control

Judge Piersol's initial Order Fixing Dates (Doc. 11) stated "*The following general discovery rules shall apply to this case:*" and then proceeded to explain that *upon request of the Defendant* the government must forthwith comply with Rule 16, that the Government must disclose <u>Brady</u> material and Jencks Act material, and established motion deadlines for all parties.  The deadlines were thereafter extended upon request.

Rule 16(E) requires the Government to, upon the Defendant's request:

permit the defendant to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody or control and:

(I) the item is material to preparing the defense;
(ii) the government intends to use the item in its case-in-chief at trial; or
(iii) the item was obtained from or belongs to the defendant.

While the Government, in its response to both Defendants' request for information about Ajax's training and qualifications, agreed to request the information from the South Dakota Highway Patrol, that information did not fall within the purview of information the Government was required to provide pursuant to Rule 16 or Judge Piersol's Order.

"The prosecution is under no obligation to turn over materials not under its control.  When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on

his own, there is no suppression by the government." United States v. Aichele, 941 F.2d 761, 764 (9ᵗʰ Cir. 1991) (Government not penalized for failing to disclose impeachment information regarding government witness which was contained in state Department of Corrections file). The Ninth Circuit has also specifically held that Rule 16 does not require the Government to obtain for the Defendant information contained in state law enforcement files. See e.g. United States v. Dominguez-Villa, 954 F.2d 562, 566 (9ᵗʰ Cir. 1992) (district court exceeded authority by excluding witness's testimony based on non-disclosure of state law enforcement materials which were not under federal Government's control). See also, United States v. Liquid Sugars, Inc.. 158 F.R.D. 466, 474 (E.D. California 1994) (documents in possession of state officials involved in investigation are not within custody or control of the federal government, and therefore need not be disclosed); United States v. Chavez-Vernaza. 844 F.2d 1368, 1374-75 (9ᵗʰ Cir. 1988) cert. den. 510 U.S. 1204, 114 S.Ct. 1324, 127 L.Ed.2d 672 (1994)(district court did not err in refusing to order Government to obtain records of which it was aware, but had no actual control, from state authorities to provide to Defendant). The Government, therefore, was not obligated to disclose the information which was in the possession and control of the South Dakota State Highway Patrol and did not violate Rule 16 or Judge Piersol's Order by disclosing it after February 25ᵗʰ.

**C.    Miscellaneous Discovery Arguments**

At the hearing, the Defendants asserted the Government waived its opportunity to object to the production of the drug dog records when it submitted Docs. 44 and 60, indicating the information was in the possession of the South Dakota Highway Patrol, had been requested, and would be provided upon receipt. TR 372-374. Defendants also assert that Judge Piersol's February 16ᵗʰ Order obligated the Government to provide discovery beyond that which is required by Rule 16. TR 381. The Defendants have cited no authority ( and the Court has found none) to support the proposition that the Government's failure to object to a discovery request or its assent to attempt to obtain records from a state agency, results in a waiver of the objection or *obligates* it to provide such material to the defense.

The Federal Rules of Civil Procedure provide for such a waiver if no objection is timely filed (see Fed. R. Civ. P. 33(b)(4)), but there is no corresponding rule in the Federal Rules of Criminal Procedure.   Likewise, Judge Piersol's February 16ᵗʰ Order did not expand the Government's

discovery obligations, originally set out in Doc. 11, which clearly stated "Upon Request of the Defendant, the Plaintiff shall forthwith comply with Rule 16(a)(1)(A), (B)( C) and (D) . . ." The original Order required the Government to comply with the provisions of Rule 16, Brady v. Maryland, the Jencks Act, and 18 U.S.C. § 3500–nothing more, and nothing less. The February 16th Order merely extended the deadlines contained in the previous Order.

Even if the Government had violated Rule 16 by its tardy disclosure of the drug dog records, striking the evidence from the record is a harsh sanction which is rarely imposed in the Eighth Circuit–even at the trial stage of the proceedings. See United States v. Thornberg, 844 F.2d 573, 580 (8th Cir. 1988) cert. den. 487 U.S. 1240, 108 S.Ct. 2918, 101 L.Ed.2d 944 (1988) (trial court has broad discretion in fashioning sanctions for Rule 16 violations and did not abuse discretion in refusing to exclude undisclosed evidence at trial). "The decision whether to admit evidence the government had failed to disclose before trial in violation of Rule 16 is one of broad discretion resting with the trial court. Because the government did not learn of the evidence until a late date and acted expeditiously to deliver it to the defense, we conclude the government did not act in bad faith in failing to disclose the evidence sooner." United States v. Longie, 984 F.2d 955, 958 (8th Cir. 1993). The Tenth Circuit has also condemned the exclusion of testimony as a discovery sanction. "[I]t would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings." United States v. Sarracino, 340 F.3d 1148, 1170 (10th Cir. 2003) cert. den. 540 U.S. 1131, 124 S.Ct. 1105, 157 L.Ed.2d 935 (2004) (noting that before imposing sanctions, the court should consider (1) the reason for the delay in producing the requested materials, (2) the extent of prejudice to the defendant as a result of the delay, and (3) the feasability of curing any prejudice with a continuance).

Defendants also suggest the Government violated Rule 16 and Rule 12(b)(4)(B) by failing to provide a copy of the search warrant and application until the suppression hearing was under way. Defendant Olivera-Mendez argued:

"The search warrant application, affidavit and return are all Rule 16 material that must be disclosed upon request if the defendant intends to file any Rule 12 pre-trial motions. See Rule 12(b)(4)(B) noting that "in order to have the opportunity to move to suppress evidence under rule 12(b)(3)( c)" the government must provide Rule 16 discovery when requested to do so by the defendant). The Defendant made a broad and general, albeit boilerplate, discovery request that included the Search Warrant

application, affidavit and return.  Clearly, a motion to quash search warrant is a pretrial motion under Rule 12, that must be brought prior to trial or is waived.  See Rule 12(e).  This particular discovery was not provided to Defendant until long after the time for pre-trial   motions had passed.  *Consequently, Defendant's motion to suppress, although raising a number of issues, did not raise any issues as to the warrant itself.  Defendant could not raise any issues as to the warrant itself, because Defendant did not have the warrant."*

The flaw in the Defendant's reasoning is that his "consequently" argument is based on fictional circumstances.  The reason Olivera-Mendez did not have the warrant in hand, and therefore raised no issue about it in his motion to suppress, is that **he hadn't even asked the government to provide the warrant yet when he made his motion to suppress.**  He **had not yet made his discovery motions-- which were two weeks late, and served on the SAME DAY as his motion to suppress.**  He claims the government should have responded to his discovery motion before (February 25) his discovery motion was made (March 3).  Given these circumstances, there has been no showing of bad faith by the Government or prejudice to the Defendant, even if the warrant and supporting affidavit  were not timely disclosed.

Finally, Defendants assert the Government violated Rule 26.2 when it "failed to timely render various narratives and police reports" and that the Defendant was prejudiced because he was "not fully prepared to cross examine the Government's witnesses during the first two parts of the suppression hearing." Doc. 93, ¶¶ 9, 17, 18.  Assuming Rule 26.2 even applies to the records which were produced during the pendency of the suppression hearing, (the drug dog training records, received on April 5th, the police reports, narratives, photos and a video, received on April 8th, and two documents regarding the drug dog's training and certification, prepared by Sergeant Duis, received on April 12th) the Rule was not violated.

Rule 26.2 provides:

(a) **Motion to Produce**.  After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

\*\*\*

(d) **Recess to Examine a Statement**. The court may recess the proceedings to allow time for a party to examine the statement and prepare for its use.

(e) **Sanction for Failure to Produce or Deliver a Statement.** If the party who called the witness disobeys an order to produce or deliver a statement, the court must strike the witness's testimony from the record. If an attorney for the government disobeys the order, the court must declare a mistrial if justice so requires.

(f) **"Statement" Defined.** As used in this rule, a witness's "statement" means:
> (1) a written statement that the witness makes and signs, or otherwise adopts and approves;
> (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording or;
> (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

***

First, these documents are not "statements" covered by Rule 26.2. Second, even if these documents are "statements, Rule 26.2 does not require the production of any "statement" until the witness has *finished* testifying on direct examination. Trooper Koltz's training records were provided before his testimony began on April 5th. The miscellaneous reports and other documents which were provided on the 8th do not appear to be "statements" from Trooper Koltz. Then, on April 12th, two more documents regarding the drug dog were provided–but these documents were created by Sergeant Andrew Duis, who had not yet testified. The only other witness who testified at the suppression hearing was Agent Miranda, who testified on May 5th, and was called by the defense.[7] TR 468. Agent Miranda's report was not produced before the hearing. Id. TR 478. A request was made during his testimony for a copy of his report. Id. The Court has not been made aware if the Government has failed to comply with this request. Because the various records and reports are not "statements" and because they were provided after the pertinent witnesses testified, as required by Rule 26.2, the rule was not violated and exclusion of the evidence is not required.

Discovery sanctions are not appropriate in this case–as to the drug dog records or any other documents which Defendants contend were disclosed late. Most of the documents about which the

---

[7]Recall that Rule 26 only requires production of a statement *on motion of a party who did not call the witness.*

Defendants complain were in the possession, custody or control of state, not federal authorities, and have been disclosed well in advance of trial, and at least during the pendency of the suppression hearing. As to the late disclosure of the warrant and supporting affidavit, Defendant Ruelas has no standing to challenge the search, and Defendant Olivera-Mendez cannot be heard to complain that he could not question the warrant before he made his motion to suppress, because he did not make his discovery requests until the day his suppression motion was filed and did not request a continuance when the warrant was produced. For all these reasons, it is respectfully recommended that the Motion to Exclude Evidence Regarding Drug Dog Certification (Doc. 88) be DENIED.

**(Motion to Suppress Evidence–Doc. 52)**

Defendants assert the cocaine found in the Isuzu should be suppressed because the traffic stop was impermissibly extended, the vehicle was seized without probable cause, and the Defendants were arrested without probable cause or a warrant. Defendant Olivera-Mendez brought the motion, but Defendant Ruelas was allowed to join (Doc. 56).[8]

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, United States v. Phillips, 540 F.2d 319 (8th Cir.1976) cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976), but on the government to justify a warrantless search or seizure. United States v. Bruton, 647 F.2d 818 (8th Cir.1981) cert. denied, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). The standard of proof is a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

### 1. Whether the Scope of the Traffic Stop Was Impermissibly Extended

Trooper Koltz testified the Isuzu was traveling 71 miles per hour in a 65 mile per hour zone. Trooper Koltz's testimony was credible, and the Defendants have not challenged the validity of the initial traffic stop. "First, a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver . . . Second, having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but

---

[8]While Defendant Ruelas has no standing to challenge the search of the vehicle for the reasons already explained, he may nonetheless challenge the lawfulness of his own detention and seek to suppress any evidence that is the fruit of his allegedly illegal detention. United States v. Green, 275 F.3d 694, 699 (8th Cir. 2002).

somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." United States v. $404,905 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999) cert. den. 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000). The officer is entitled to "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver . . . if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002) cert. den. 538 U.S. 992, 123 S.Ct. 1815, 155 L.Ed.2d 691 (2003) (citations and internal punctuation omitted).

Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by examining the totality of the circumstances, in light of the officer's experience. U.S. v. Morgan, 270 F.3d 625, 630 (8th Cir. 2001) cert. den. 537 U.S. 849, 123 S.Ct. 192, 154 L.Ed.2d 79 (2002). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in total." Id. at 631 (citations omitted). In Morgan the factors articulated by the trooper (who had eleven years of experience, seven as a drug dog handler) were: the intense smell of smoke, perfume and air freshener, extreme nervousness by the driver and passenger exhibited by avoidance of eye contact, an itinerary which included drug source and demand states, large duffel bags which appeared to contain square objects, and divergent stories regarding travel plans. The Court held that the totality of the circumstances, including the officer's training and experience in detecting contraband, were sufficient to constitute reasonable suspicion to expand the scope of the traffic stop. Id. at 631.

The totality of the circumstances is similar here: the strong scent of air freshener-- and two air fresheners, one in front and one in the cargo area, the driver's nervousness exhibited by avoidance of eye contact and constant tapping on his knee. Here there were additional circumstances as well: the unusual circumstances regarding the photocopied driver's license and other documentation regarding the vehicle containing a third party's name, along with temporary plates registering the vehicle in a state other than where the driver claimed to live, using what the driver claimed was a

friend's address, and divergent stories from the driver and the passenger regarding their itinerary and other historical details.[9]  Given the totality of the circumstances, Trooper Koltz had enough reasonable suspicion to expand the scope of the traffic stop.

More importantly, however, "even if the facts had not been sufficient for reasonable suspicion . . . a short detention for a dog sniff would not violate the Fourth Amendment. Here, the dog was at the scene from the beginning, and it only took a short time to walk the dog over to the van where it alerted to the presence of drugs." Morgan, 270 F.3d at 631.  In this case, Ajax was on the scene from the beginning and Trooper Koltz ran Ajax around the Isuzu while he was waiting for the radio dispatch to return information about Defendant Olivera-Mendez's driver's license.  While Trooper Koltz may have already written the warning ticket, he had not finished the traffic stop because he had not yet checked the driver's license information, which is one of the routine ministerial tasks related to completing a traffic stop violation.  The call to dispatch about the license information was made at 3:28, fourteen minutes after the traffic stop began and before the stop was complete.  There was no unreasonable delay in this case.  Further, the Eighth Circuit has recognized there is no Fourth Amendment violation when the drug dog is allowed to conduct a sniff even *after* the traffic stop is concluded, and even in the absence of reasonable suspicion,  if the dog is immediately available.  In United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 649 (8th Cir. 1999) cert. den. 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000) the Court determined the traffic stop was complete before the canine sniff was performed, and the sniff was performed in the absence of reasonable suspicion.  Nonetheless, the trooper's conduct "on the whole was not constitutionally unreasonable."  Id.

> When a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure, it does not violate the Fourth Amendment to require that the offending motorists's detention be momentarily extended for a canine sniff of the vehicle's exterior.

---

[9]The Court takes note of defense counsel's attempts to impugn Trooper Koltz's credibility (i.e. the discrepancy regarding the amount of time that passed before the search warrant was obtained, whether the Defendant's Hispanic ancestry held any significance to Trooper Koltz, that the air fresheners were not included on the vehicle inventory completed by him).  The Court had the opportunity to observe Trooper Koltz testify over the course of two days on direct examination, cross-examination, and re-cross-examination.  He was a credible witness.

Id. See also United States v. Gregory, 302 F.3d 805, 810 (8th Cir. 2002) cert. den. 538 U.S. 992, 123 S.Ct. 1815, 155 L.Ed.2d 691 (2003) ("a short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment. [The defendant] did not present evidence that the dog sniff itself was unduly lengthy, and the record indicates that just over twenty minutes elapsed from the beginning of the traffic stop to the completion of the sniff."). The United States Supreme Court has held that no reasonable articulable suspicion is required to justify the use of a drug dog to sniff a vehicle during a legitimate traffic stop. Illinois v. Caballes, 125 S.Ct. 834 (2005). "The use of a well-trained narcotics detection dog –one that does not expose non-contraband items that would otherwise remain hidden from public view during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized[10] for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of constitutionally cognizable infringement." Id. at 838. Pursuant to the law of the Eighth Circuit and the United States Supreme Court, the traffic stop was not impermissibly extended in this case when, fourteen minutes after it began and before Trooper Koltz had finished his routine ministerial tasks, Ajax got out of the patrol car and ran around the Isuzu to sniff for drugs.

### 2.    Whether Probable Cause Supported the Search of the Isuzu

Defendants next assert the Isuzu was searched without probable cause. This argument is premised on Defendants' assertion that the Government has not sufficiently proven Ajax's reliability.

It is well established in the Eighth Circuit that once a reliable drug dog has alerted, probable cause is established, and the vehicle may be searched without a warrant. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) cert. den. 514 U.S. 1113, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); United States v. Brown, 345 F.3d 574, 581 (8th Cir. 2003); United States v. Yang, 345

---

[10]There is language in Caballes which suggests the United States Supreme Court might reach a different conclusion from the Eighth Circuit regarding the use of the drug dog after the stop has concluded. See Caballes at 837. It is not necessary to make that determination here, however, because in this case Trooper Koltz was waiting for the driver's license information from dispatch and had not yet concluded the traffic stop when Ajax ran around the Isuzu and alerted.

F.3d 650, 656 (8th Cir. 2003) cert. den. 541 U.S. 952, 124 S.Ct. 1694, 158 L.Ed.2d 384 (2004). "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." United States v. Sundby, 186 F.3d 875, 876 (8th Cir. 1999). To establish a dog's reliability, the testimony need  only  establish that the dog has been trained and certified to detect drugs–a detailed account of the dog's track record or education is not required. Id.[11]    The Court must "look behind" the statement that the dog has been properly trained and certified only when it has  been presented with sufficient evidence that (1) it has been intentionally or recklessly misled; (2) given an intentionally false statement;  or (3) that material information has been omitted that would alter the probable cause determination.  Id. [12]  See also United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) cert. den. 528 U.S. 894, 120 S.Ct. 294, 145 L.Ed.2d 188 (1999) (drug dog reliable–although he had failed two previous tests, he was currently certified at the time of the traffic stop in question); United States v. Robinson, 390 F.3d 853, 874 (6th Cir. 2004) ("after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications."). The following discussion from Robinson is particularly pertinent here:

> We will not disturb these factual findings on the basis of mere suggestions that the training of drug detection dogs could be refined in various ways to improve the reliability of positive alerts.  Indeed, it would be particularly inappropriate to insist that a mini-trial be held on a drug dog's training and performance before a law enforcement officer could cite a positive alert as a basis for obtaining a warrant. Even if such a hearing might raise some doubt about the reliability of a particular alert, an officer is surely entitled to rely in good faith upon the existence of probable cause as determined by a neutral magistrate, so long as the dog in question has generally certified as a drug detection dog. . .
>
> During the mini-trial which was held during this suppression hearing, ample testimony and

---

[11]The lesson to be learned from Sundby is that while the Government is not required to produce records in the possession of the State Highway Patrol, the timely provision of records which verify current certification of drug dogs would likely significantly shorten future suppression hearings.

[12]Despite the language in Sundby, in United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001), the Eighth Circuit held that a dog who was apparently not currently certified was sufficiently reliable to support a probable cause finding.

documentary evidence was received which supports Ajax's certification and training as a drug detection dog. That January 13, 2005 was his first day on the job does not detract from his status as a certified dog. The Court is not persuaded that (1) it has been intentionally misled; (2) it has been given an intentionally false misstatement; or (3) material information has been omitted which would alter the probable cause determination. Sergeant Duis was a credible witness, who testified Trooper Koltz and Ajax met the requirements for certification.[13] Their certificate indicating they successfully demonstrated the minimum performance requirements as a Narcotics Detector Dog Team was admitted into evidence as EX 6. There was sufficient probable cause, therefore to seize and search the Isuzu.

**3.    Whether the Seizure of the Isuzu was Improperly Extended When it Was Towed to the Highway Patrol Garage**

The Defendants assert the seizure of the Isuzu became unreasonable when the initial search revealed no drugs, and the Isuzu was towed to the Highway Patrol garage, where it remained for several hours, until Trooper Koltz eventually obtained a search warrant from a state court judge. The affidavit in support of the search warrant specifically described a suspected hidden compartment, and requested permission to dismantle the hidden compartment area. The search warrant was signed by Honorable Gene Paul Kean at 9:04 p.m.

The seminal case regarding automobile searches, from the days of prohibition, is Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925). In that case, the United States Supreme Court held that a warrantless search of an automobile which included removing the seat upholstery to find contraband (liquor) did not violate the Fourth Amendment, so long as the search was supported by probable cause. The transportation of contraband and the law regarding vehicle searches has become much more sophisticated since Carroll.

"The Supreme Court has held that a search which unduly extends a detention may violate the Fourth Amendment's requirement of reasonableness." United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). It is important to remember, however, that "a dog alert creates general

---

[13]Despite Defendants' assertions to the contrary, when Sergeant Duis's testimony regarding the grading system and requirements is compared to the grading sheet, it is apparent that Trooper Koltz and Ajax achieved passing scores in all the required skill areas. See EX 5.

probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand." Id. at 1153.    That drugs were not immediately found after Ajax alerted, therefore, does not necessarily mean the seizure was unreasonably extended when the Isuzu was towed to the Highway Patrol garage for a more thorough search.

Trooper Koltz suspected from the beginning that drugs would be found in a secret compartment.  He believed his search would eventually reveal some way to access the secret compartment without physically dismantling the body of the vehicle (i.e. through electronic access or a through a cutout panel in the floor or the gas tank–TR 153).  Efforts to access the secret compartment without dismantling the body of the vehicle were ultimately unsuccessful, and the officers sought consent to drill a small hole into the bed of the cargo area.  Consent was not given, and the officers then sought a warrant to dismantle.  At least two Circuit Courts of appeal have held that no warrant is required to dismantle a vehicle once a dog sniff has established probable cause to search.  See United States v. Patterson, 65 F.3d 68, 71 (7th Cir. 1995) cert. den. 516 U.S. 1061, 116 S.Ct. 740, 133 L.Ed.2d 689 (1996) (automobile exception to warrant requirement includes search behind tailgate cover, where drug dog alerted to tailgate area); United States v. Zucco, 71 F.3d 188, 191-92 (5th Cir. 1995) cert. den. 519 U.S. 827, 117 S.Ct. 91, 136 L.Ed.2d 47 (1996) (If supported by probable cause, automobile exception to the warrant requirement permits authorities to search every part of vehicle which may conceal the object of the search.  "In this case the government had probable cause to search the vehicle and was authorized to examine behind the wall after the drug dog alerted at that location.").  Trooper Koltz opted to use the "better practice" and obtain a warrant.

The Eighth Circuit has noted that "once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement."  United States v. Friend, 50 F.3d 548, 552 (8th Cir. 1995) cert. den. 516 U.S. 1093, 116 S.Ct. 814, 133 L.Ed.2d 759 (1996).  In Friend, the automobile was impounded before the vehicle was searched.  There, the Court noted, "[i]n this case, the police commendably followed the 'better practice' and obtained a warrant before searching the locked car . . . the search was valid, and the district court properly denied [the defendant's] motion to suppress."

An automobile search which included dismantling a vehicle after obtaining a warrant the day after a vehicle was seized was upheld as constitutionally reasonable in United States v. Yang, 345

F.3d 650, 655-56 (8th Cir. 2003) cert. den. 541 U.S. 952, 124 S.Ct. 1694, 158 L.Ed.2d 384 (2004). In that case, the vehicle was searched three times: the trunk and passenger compartment were searched pursuant to consent at the roadside, then the vehicle was taken to a nearby truck stop where it was searched again after a drug dog arrived at the scene and positively alerted. The third search occurred the following day, when the officers dismantled the vehicle after they obtained a search warrant.

An automobile search need not be completed immediately to be reasonable under the Fourth Amendment. "We believe the proper rule is that, once a reasonable basis for the search of an automobile has been established, the search need not be completed on the shoulder of the road. Since the . . . highway patrol officer who searched the car had previously received consent to do so, completion of that search at a later date was not unreasonable within the meaning of the Fourth Amendment." United States v. Casares-Cardenas, 14 F.3d 1283, 1286 (8th Cir. 1994) cert. den. 513 U.S. 849, 115 S.Ct. 147, 130 L.Ed.2d 86 (1994). In Casares-Cardenas the officer had consent to search–in this case, the officer had probable cause based on the dog sniff. The reasonableness inquiry, however, is the same. "Once the basis for the warrantless search has been established, requiring it to be done immediately or within some narrow time limit might result in a more intrusive search than either necessary or desirable in a free society." Id. See also, United States v. Hephner, 103 Fed. Appx. 41 (Unpublished, copy attached).[14] The Court's discussion in Hephner is helpful here:

> After Woody [the drug dog] alerted, the decision was made to move the pickup truck to the DOT facility. Unquestionably, this decision did not run afoul of the Fourth Amendment. Finally, once the truck was moved to the DOT facility, the troopers diligently proceeded with the search of the truck, in an effort to confirm the findings of Woody. Because the troopers were diligent in pursuing reasonable lines of investigation, including taking the reasonable step to call a locksmith to open the toolbox in a manner that would preserve its structural integrity and result only in an insignificant delay, we cannot take issue with the length of the stop in this case. In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during

---

[14]Pursuant to Eighth Circuit Rule 28A(i),unpublished opinions have no precedential value. The Hephner case is cited here because the facts are similar to the case at bar.

which time it was necessary to detain the defendant.

Id. at 46 (citations omitted, internal punctuation altered). In this case, Trooper Koltz testified the officers continually searched the vehicle. They asked permission to gain access to the suspected secret compartment by drilling a small hole, and when permission was denied (approximately 6:30 p.m.) they began preparing an application for a search warrant and supporting affidavit. The search warrant was approved by a local state judge at 9:04 p.m. While this detention was much longer than a normal traffic stop, Trooper Koltz "diligently proceeded with the search" of the Izuzu, in "reasonable lines of investigation" to confirm the findings of Ajax. See also United States v. Taylor 955 F.Supp. 763, 769 (E.D.Mich. 1997) (if police have probable cause to justify warrantless seizure of automobile, they may conduct either an immediate or delayed search; probable cause does not evaporate if drugs are not immediately found during roadside search after dog sniff). The Taylor Court noted,

> [t]here is no arbitrarily-determined time limit imposed by the Fourth Amendment such that a search, once commenced, must continue without abatement. Indeed, to impose such a rule that searches must be immediate or uninterrupted would provide perverse and unproductive incentives to officers. It would foster a legal environment in which an officer at the roadside, with probable cause to search an automobile, would have to remove that vehicle's occupants, and require them to remain outside the vehicle even in the most inclement of weather while the officer conducted in full view of the public as thorough a search for as long a time as can be justified, all to avoid being held to have abandoned the search at the first pause. For example, if during the course of such a search, the officer discovered evidence indicating the vehicle needed to be disassembled to discover contraband, must the officer disassemble the vehicle by the side of the road?

Applying these principles to this case, Trooper Koltz should not be required to carry a cordless drill and a hacksaw in his patrol car, nor should the law encourage him to, at roadside, drill into the bed of a vehicle or saw it open before he has carefully exhausted other options in the face of probable cause to believe a vehicle may have a secret compartment containing drugs. This is precisely the "more intrusive search than either necessary or desirable in a free society" the Court warned against in United States v. Casares-Cardenas, 14 F.3d 1283, 1286 (8th Cir. 1994)cert. den. 513 U.S. 849, 115 S.Ct. 147, 130 L.Ed.2d 86 (1994). Given the unique facts of this case, the seizure of the Isuzu was not improperly extended when it was towed to the Highway Patrol garage where it was further searched, a search warrant was ultimately obtained, and after the warrant was issued, drugs were

found in a secret compartment in the cargo area.

### 4. Whether the Detention of Mr. Olivera-Mendez and Mr. Ruelas Requires the Suppression of Any Evidence

Finally the Defendants assert their detention at the Highway Patrol garage was unreasonably long, was essentially a custodial arrest and interrogation not supported by probable cause, and should result in the suppression of the drugs which were found in the Isuzu.

First, the Defendants were in custody while they were at the Highway patrol garage. An individual is in custody when he has been formally arrested or his freedom of movement has been restrained to a degree associated with a formal arrest. Relevant inquiries are whether the suspect is free to leave the scene, the purpose, place, and length of the questioning, and whether a reasonable person in the suspect's position would have considered himself to be in custody. The mere fact that an investigation has focused on a particular suspect does not trigger the need for *Miranda* warnings in noncustodial settings. United States v. Goudreau, 854 F.2d 1097, 1098 (8th Cir. 1988) (citations omitted). Also, "[i]n determining whether a suspect is 'in custody' the relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989)(citations omitted). A reasonable person in the Defendants' position would have, until the moment they asked to go eat and were taken to the truck stop, not believed they were free to leave.[15] The Defendants were initially detained only for a traffic ticket, but thereafter were repeatedly told they could not go until it was determined there were no drugs in the Isuzu. The relevant inquiry then becomes whether their detention was improper, and/or whether discovery of the drugs in the Isuzu was the "fruit" of their detention.

In his brief, Defendant Olivera-Mendez asserts there is no authority that a dog sniff provides probable cause for arrest. "And when the dog alerted, there was probable cause to arrest [the defendants] and to search the vehicle without a warrant . . ." United States v. Klinginsmith, 25 F.3d

---

[15]Agent Miranda testified that to his knowledge, neither he nor anyone else ever advised Mr. Olivera-Mendez or Mr. Ruelas of their *Miranda* rights. TR 473. The Defendants have moved only to suppress evidence, not statements. Nonetheless, if any statements were made by Defendants at the Highway Patrol garage, they should be suppressed in light of the Court's finding the Defendants were in custody and were not advised of their *Miranda* rights. The statements on the roadside were not custodial should be admissible.

1507, 1510 (10th Cir. 1994) cert. den. 513 U.S. 1159, 115 S.Ct. 1069, 130 L.Ed.2d 602 (1994) (citations omitted).  "The dog alerted almost immediately to the driver's side outside wall of the gray van.  At that point, probable cause existed for the arrest of the Defendant and for an intensive search of the gray van." United States v. Lasso-Barrios, 958 F.Supp. 283, 287 (W.D. Tex. 1997).

It is unknown whether the Eighth Circuit will find a dog sniff is sufficient to create probable cause for arrest, but that is not the issue here. The probable cause for the arrest was finding cocaine in the hidden compartment of the car in which they were riding.  At the very least, however, Trooper Koltz did not violate the Defendants' Fourth Amendment rights when he detained them for a little over three hours while he searched the Isuzu, based on the probable cause which arose when Ajax alerted at the roadside.  "In any event, once the dog alerted, it was reasonable to continue the detention of the defendants during the search of the van." United States v. Parada, 289 F.Supp.2d 1291, 1301 (D. Kansas 2003).  "If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.  Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause  implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981).  Recently, the Supreme Court held detention in handcuffs for between two and three hours during a search did not violate the Fourth Amendment. "An officer's authority to detain incident to search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." Muehler v. Mena, 125 S.Ct. 1465, 1470 (2005).  Granted, Michigan and Muehler were both detentions based on search warrants, but the Supreme Court has noted regarding warrantless auto searches, "the scope of a warrantless search based on probable cause is no narrower-- and no broader–than the scope of a search authorized by a warrant supported by probable cause.  Only the prior approval of the magistrate is waived.; the search otherwise is as the magistrate could authorize." United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982).  The scope of authority to detain founded  on a warrantless, but probable cause supported  search should likewise be no narrower than what is described in Michigan and Muehler.

-28-

Even assuming the Defendants' detention was illegal, the result would be the same. "When determining whether evidence from an illegal arrest must be suppressed the question is whether police obtained the evidence by exploitation of the illegality." United States v. Neatherlin, 66 F.Supp.2d 1157, 1162 (D. Montana 1999) aff'd 243 F.3d 551 (9th Cir. 2000), cert. den. 533 U.S. 960, 121 S.Ct. 2615, 150 L.Ed.2d 769 (2001), quoting Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "Suppression is warranted when there exists a sufficiently close relationship between the arrest and the seizure. Evidence must be suppressed whenever its discovery was brought about *only* because of the suspect's illegal detention." Neatherlin, 66 F.Supp.2d at 1162. In Neatherlin, the Court agreed the Defendant had been illegally placed under arrest during a traffic stop. The drugs found in the vehicle, however, were not suppressed.

> Here, the positive indication by the drug dog is an independent intervening event after a justifiable stop that led police to the evidence. The Government gained nothing from [the defendant's] arrest and used nothing from his arrest to help them find the drugs in the truck. Nor did they use anything gained during his arrest to get probable cause to search the truck. Probable cause was supplied by the dog indicating the presence of drugs in the vehicle. This independent intervening event removes the results of the search from any exploitation of the illegal arrest.
> ***
> The only evidence the officers obtained from [the defendant] after he was technically under arrest was [his] statement that he was snow boarding. While this statement may have increased the officer's suspicion, it is not necessary for the probable cause to search [his] vehicle. Probable cause to search the vehicle came from the positive indication by the drug dog.

Id. at 1162-63. Similarly, Trooper Koltz obtained probable cause to search within the first fourteen minutes of this traffic stop, long before the Defendants' detention became custodial. Nothing was gained by any "exploitation" of the custodial detention. In fact, the Defendants consistently denied the presence of illegal drugs during the custodial portion of their detention. The officers used nothing from the Defendants' detention at the highway patrol garage to help them locate the drugs. The Defendants said they were hungry, and at their request, they had been dropped off at the Flying J truck stop unsupervised. Presumably they were at the Flying J when the fifteen kilos of cocaine were located in the secret compartment of the Isuzu. The Government gained nothing from defendants to help them find the drugs in the secret compartment.

## CONCLUSION

Mr. Ruelas has no standing to challenge the search of the Isuzu, and therefore no standing to challenge the reliability of Ajax.   Additionally, the Government was not obligated to disclose records in the possession of a state agency; hence their disclosure on April 5th and April 12th did not violate the Rules of Criminal Procedure  or Judge Piersol's Scheduling Order.  It is respectfully recommended to the District Court that Defendant's Motion to Exclude Evidence Regarding Drug Dog Certification (Doc. 88) be **DENIED**.

Trooper Koltz did not impermissibly extend the scope of the traffic stop, and Ajax's alert created probable cause for the search of the Isuzu.  The search, although lengthy, was reasonable. It was not unreasonable to detain Mr. Olivera-Mendez and Mr. Ruelas during the search.  Even if their detention became unreasonable at any point, the Government gained nothing from it, so nothing must be suppressed.  The Defendants consistently denied the presence of contraband.  Rather, it was the drug dog's initial sniff (probable cause to search) and the officers' persistence which led to the discovery of the drugs.  In other words, the tree, even if it was poisonous, bore no fruit.  It is respectfully recommended, therefore, that the Defendants' Motion to Suppress Evidence (Doc. 52) be **DENIED**.

**NOTICE TO PARTIES**

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this _____ day of June, 2005.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _____, Deputy
(SEAL)